# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **CHRISTINE ANN V.,**[1] | ) | **NO. CV 18-4704-KS** |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **NANCY A. BERRYHILL**, Acting | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## INTRODUCTION

Christine Ann V. ("Plaintiff") filed a Complaint on May 29, 2018, seeking review of the denial of her application for a period of disability and Disability Insurance benefits ("DI"). (Dkt. No. 1.) On July 16, 2018, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 9, 10, 11.) On January 30, 2019, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 17.) Plaintiff seeks an order reversing the Commissioner's decision and ordering the payment of benefits or, in the alternative, remanding for further proceedings. (Joint Stip. at 18-19.) The

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

Commissioner requests that the ALJ's decision be affirmed or, in the alternative, remanded for further proceedings. (*See id.* at 19-20.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On September 18, 2014, Plaintiff, who was born on August 24, 1968[2], filed an application for a period of disability and DI. (*See* Administrative Record ("AR") 183-186.) Plaintiff alleged disability commencing March 6, 2013 due to chronic myofascial, fibromyalgia, stenosis in neck, back problems – double disc replacement, TMJ[3], migraines, left shoulder injury, insomnia, teeth pain, fatigue, depression, anxiety, and right foot-bunion. (AR 199.) Plaintiff previously worked as an attorney. (AR 200.) The Commissioner denied Plaintiff's application initially (AR 124-127), and on reconsideration (AR 129-133). Plaintiff filed a written request for a hearing by an Administrative Law Judge. (AR 135-136.)

On February 1, 2017, Administrative Law Judge ("ALJ") Kyle Andeer held a hearing, at which testimony was given by Plaintiff, who was represented by counsel, and Vocational Expert ("VE") Gregory Jones. (AR 50-90.) On April 4, 2017, the ALJ issued an unfavorable decision in which he denied Plaintiff's application from the alleged onset date through the date of his decision. (AR 15-36.) On June 1, 2017, Plaintiff filed a Request for Review of Hearing Decision/Order. (AR 182.) On May 8, 2018, the Appeals Council denied Plaintiff's request for review. (AR 1-6.) The ALJ's April 4, 2017 decision is the final decision of the Commissioner. (*See* Joint Stip. at 1.) This timely action followed. (Dkt. No. 1.)

//

---

[2] Plaintiff was 44 years old on the alleged onset date and was thus defined as a younger person under agency regulations. *See* 20 C.F.R. § 404.1563(c); and AR at 31. Plaintiff has since changed age categories and is now categorized as a person closely approaching advanced age. *See id.* §§ 404.1563(d), 416.963(d); *and see* Joint Stip. at 1.

[3] "TMJ" refers to temporomandibular joint, the joint that connects the jaw to the temporal bones of the skull. *See* https://www.webmd.com/oral-health/guide/temporomandibular-disorders-tmd#1 (last accessed on June 13, 2019).

**SUMMARY OF ADMINISTRATIVE DECISION**

Applying the five step evaluative process, the ALJ initially found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018.  (AR 20, 107.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 6, 2013.  (AR 20.)  The ALJ determined at step two that Plaintiff had the following severe impairments:  fibromyalgia, myofascial pain syndrome, migraine headaches, status post sesamoid repair, anxiety disorder and depression.  (AR 20.)  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (AR 26.)  In particular, the ALJ found that the severity of Plaintiff's mental impairments did not meet the criteria of sections 12.04 or 12.06, because she had only "mild limitations" in understanding, remembering, or applying information, had "normal mental status exams with normal memory, concentration, persistence and pace," and had "no significant or current history of any mental health treatment by a mental health professional." (AR 26.)  The ALJ determined that, during the relevant period, Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work as defined by 20 CFR 404.1567(a) with no greater than occasional fine and gross manipulation, no greater than low stress work, no more than occasional decision-making or judgment, and no more than occasional changes at work."  (AR 27.)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work as an insurance attorney, DOT[4] 110.117-014.  (AR 31.)  However, based on the VE's testimony, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative sedentary occupations such as Call Out Operator, DOT 237.367-010, and Surveillance System Monitor, DOT 279.367-

---

[4]    "DOT" refers to the *Dictionary of Occupational Titles*.

010. (AR 31.) Thus, at step five, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through April 4, 2017. (AR 32.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630;

*see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

## DISCUSSION

The parties present two disputed issues:

(1) Whether the ALJ erred in his step 5 finding by relying on VE testimony that was inconsistent with SSA policy; and

(2) Whether the ALJ erred in his evaluation of Plaintiff's credibility and subjective symptoms.

(Joint Stip. at 2.)

## I. The ALJ Did Not Err in Relying on the VE's Testimony at Step Five

### A. Applicable Law

At step five of the evaluative process, the ALJ must determine whether the applicant is able to do other work considering her RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520(g); and 20 C.F.R. § 404.1566(e) (approving use of VE to determine whether a claimant's "skills can be used in other work and the specific occupations in which they can be used"). The Ninth Circuit has emphasized that "[a] VE's recognized expertise provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th

Cir. 2005). Thus, an ALJ may properly rely on a VE's testimony regarding the number of jobs in the national economy that Plaintiff may perform given her functional limitations. *Id.*

**B. Discussion**

Plaintiff argues that the ALJ improperly relied on VE testimony that was inconsistent with Social Security Administration ("SSA") policy. Plaintiff contends that because the ALJ found Plaintiff capable of performing "sedentary work with no greater than occasional fine and gross manipulation, no greater than low stress work, no more than occasional decision-making or judgment, and no more than occasional changes at work," the ALJ erred in relying on the VE's testimony that these limitations would not preclude her ability to perform other representative sedentary occupations available in the national economy. (Joint Stip. at 3.) Plaintiff asserts that the VE's testimony and the ALJ's step five finding are "inconsistent with SSA policy because they found jobs existed that Plaintiff could perform at the unskilled sedentary level with significant restrictions of 'not more than occasional' bilateral dexterity of her upper extremities." (*Id.*)

Plaintiff supports this argument by pointing to SSR 96-9p, which provides that "unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions" and the regulation's notation that "a significant manipulation limitation of an individual's ability to handle and work with small objections with both hands will result in a significant erosion of the unskilled sedentary occupational base." (*Id.* at 2 (citing SSR 96-9p).) Plaintiff's argument also relies on an excerpt from SSR 83-14 that purportedly states, "a limitation to unskilled sedentary work with an additional loss of bilateral manual dexterity that is significant . . . warrants a conclusion of 'Disabled.'" (Joint Stip. at 2.)

Defendant responds that the ALJ did not err and properly found Plaintiff, a younger individual, not disabled because she can perform work as a call out operator (DOT 237.67-10)

and surveillance system monitor (DOT 279.367-010). (Joint Stip. at 3.) Defendant points out that the VE specifically testified that these jobs "are consistent with occasional bilateral dexterity." (Joint Stip. at 4; *and see* AR 86.) Defendant notes that "the call out operator is consistent with occasional hand use and the surveillance system monitor required even less hand use." (Joint Stip. at 4 (citing AR 32).) Defendant also disputes Plaintiff's characterization of SSR 96-9p's requirements. (*Id.*) In particular, Defendant emphasizes that while SSR 96-9p provides that significant manipulation limitations may erode the "unskilled sedentary occupational base," the regulation does not set out a rule that a person with such limitations is per se disabled. (*Id.*)

Plaintiff, in reply, reiterates that the jobs identified by the VE are contrary to the Agency's regulatory policies and definitions and therefore the VE's testimony is unreliable. (*Id.* at 5.) Plaintiff also argues that Defendant failed to address the requirements of SSR 83-14. (*Id.*) After reviewing the record as a whole, the Court finds that Plaintiff's arguments are unpersuasive.

First, Plaintiff mischaracterizes the excerpted language from SSR 83-14. Rather than requiring a finding of disability for Plaintiff based on the RFC determination made in this case, the portion of the regulation that Plaintiff cites, when read in its entirety, in fact refers to an example in the Appendix to the regulations that states in relevant part:

Examples of Evaluation Involving Combinations of Exertional and Nonexertional Limits
1. Sedentary exertion combined with a nonexertional impairment. Example 1 of section 201.00(h) in Appendix 2 *illustrates a limitation* to unskilled sedentary work with an additional loss of bilateral manual dexterity that is significant and, thus, warrants a conclusion of "Disabled."

//

SSR 83-14, 1983 WL 31254, at * 4 (emphasis added). Contrary to Plaintiff's assertions, this language in SSR 83-14 does not require a finding of "Disabled" in this case, where the ALJ did not find that Plaintiff has significant limitations in bilateral manual dexterity.

A close reading of SSR 96-9p reveals that nothing in that regulation either is inconsistent with the ALJ's determination of Plaintiff's RFC or mandates a finding of disability here. The relevant portion of SSR 96-9p that addresses manipulative limitations, provides:

> Any *significant* manipulative limitation of an individual's ability to handle and work with small objections with both hands will result in a significant erosion of the unskilled sedentary occupational based. . . . When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

SSR 96-96, 1996 WL 374185, * 8 (July 2, 1996) (emphasis in original). Here, the ALJ found Plaintiff could perform sedentary work "with no greater than occasional fine and gross manipulation." (AR 27.) In an effort to determine whether an individual with Plaintiff's limitations could perform her past relevant work as an attorney, the ALJ posed a hypothetical to the VE based on a "sedentary hypothetical person with reaching imitations and the gross and fine manipulation limitations . . ." and asked if that person could do Plaintiff's past work as an attorney. (AR 86.) The VE replied "no," but opined that there would be other work that such a person could perform with only "occasional reaching, handling, fingering" and only two occupations would fit those limitations: the call-out operator position and surveillance system monitor position. (AR 86-87.) Thus, the ALJ relied upon the VE, a vocational resource, exactly as the regulation instructs. (AR 83-86.) Defendant further argues that SSR 96-9p defines a "significant manipulative limitation" as an impairment "that prevents the performance of any sedentary occupations that require bilateral manual dexterity." (Joint Stip. at 4.) As noted above, the ALJ found that Plaintiff was limited to "occasional reaching,

handling, fingering" and there is no evidence in the record suggesting any greater limitations in Plaintiff's manual dexterity. Notably, Plaintiff does not challenge the RFC determination.

Accordingly, the Court finds no legal error in the ALJ's reliance upon the VE's testimony in finding at step five that other occupations existed in significant numbers in the national economy that Plaintiff can perform given her age, education, and RFC and this issue does not warrant remand.

## II. The ALJ's Assessment of Plaintiff's Credibility and Subjective Symptoms Does Not Warrant Remand

### A. Legal Standard

In order to find Plaintiff's testimony regarding the severity of her pain and impairments unreliable, the ALJ was required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (citation omitted). The ALJ conducts a two-step analysis to assess subjective testimony where, under step one, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptom. *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (citations omitted). If the claimant meets this threshold and there is no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* at 1281, 1283–84.[5]

---

[5] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p, which required the ALJ to assess the credibility of a claimant's statements. SSR 16-3p focuses on the existence of medical cause and an evaluation of "the consistency of the individual's statements about the intensity, persistence, or limiting effects of symptoms with the evidence of record without consideration of the claimant's overall 'character or truthfulness'." *See* Guide to SSA Changes in Regulations and Rulings 2016-17, June 2017. The revised standard is applicable here where the ALJ rendered his decision on April 16, 2017. Nonetheless, the Ninth Circuit has acknowledged that SSR 16-3p is consistent with existing precedent that requires the

Notably, "subjective pain testimony cannot be rejected on the *sole* ground that it is not fully corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (emphasis added) (citation omitted). Further, an ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities either: "contradict [the plaintiff's] other testimony"; or "meet the threshold for transferable work skills" – that is, where the plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Orn*, 495 F.3d at 639; *Smolen*, 80 F.3d at 1284 n.7. The ALJ must "specifically identify the testimony [from the claimant that] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "General findings are insufficient." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). When the ALJ's assessment of a claimant's testimony is reasonable and supported by substantial evidence, the Court may not "second-guess" the ALJ's assessment. *See Rollins v. Massanari*, 261 F.3d at 857. Finally, the ALJ's finding may be upheld even if not all of the ALJ's reasons for discounting the claimant's testimony are upheld. *See Batson v. Comm'r of the SSA*, 359 F.3d 1190, 1197 (9th Cir. 2004).

**B. Discussion**

**i. Plaintiff's Subjective Statements**

At the hearing, Plaintiff testified that her problems "have spanned a long period of time." (AR 53.) She testified that her "left shoulder is always screwy" and she has "a very bad problem with the typing and especially the mouse use." (*Id.*) Plaintiff also described the

---

assessments of an individual's testimony be focused on evaluating the "intensity and persistence of symptoms" after the ALJ has found that the individual has medically determinable impairments that could reasonably be expected to produce those symptoms. *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017).

ongoing pain in her foot caused by the sesamoid injury. (*Id*. at 54.) She said that bunion surgery "made that sesamoid problem worse" and she gets cramps in her feet and it hurts to wear shoes. (*Id*. at 55.) She was able to drive to the hearing on her own, wearing flip flops. (*Id*.) Plaintiff experiences pain throughout her body and said she has "good days and bad days":

> the left side, basically, I had my jaw, my teeth, my neck, my shoulder and my arm, the pain is there all the times. Sometimes very, very bad. Sometimes not quite as bad, but it never goes away.

(*Id.* at 56.) Plaintiff explained that she has "what's called chronic myofascial pain" that makes her muscles spasm "for no good reason." (*Id.*) She grinds her teeth and wears a night guard. (*Id.* at 57.) She attributed the teeth grinding to "more muscle stress than necessarily mental stress, but [said] it's probably a combination of both." (*Id*. at 60.) She testified that she has frequent headaches, often more than one per day and takes migraine medication. (*Id*. at 60-61.) Sometimes the headaches cause her to lie down for the rest of the day. (*Id.* at 61.) She said on most days "I have at least one or three or four depending." (*Id.*) Plaintiff testified that sometimes she can massage her headache and make it go away before she takes the medicine. (*Id.* at 61-62.) Later in her testimony, in response to a question about how often she has headaches that last an hour, Plaintiff testified that "on average I usually have three in a day." (*Id.* at 77.)

Plaintiff testified that her daily activities included getting up, getting dressed, getting her daughter up, taking the dogs out, brushing her daughter's hair, and pouring her milk.[6] (*Id.* at 63.) Plaintiff said she drives her daughter to school and goes to the gym to ride the exercise bike for 30 minutes, she returns home, takes the dogs out again, then "mostly hang[s] out on

---

[6] At the time of the hearing, Plaintiff's daughter was seven and her son was sixteen years old. (AR 64.) Her husband was a Sergeant with the Los Angeles Police Department. (AR 66.)

the sofa." (*Id*.) She said that she does not "do a whole lot," her husband does most of the housework and a majority of the laundry. (*Id*.) Plaintiff testified that her daughter's school is less than five minutes from her home and she takes her "most everyday to school" and "pick[s] her up most every day." (*Id*. at 74.)

Plaintiff stated that she sees Dr. Miller, a pain doctor, who prescribes her medications, including Botox for her headaches and Dr. Nagle an orthodontist, who treats her TMJ issues. (*Id*. at 64-65.) Plaintiff testified that she has "[p]retty strong depression" for which she takes nortriptyline, an anti-depressant, and Ativan at bedtime. (*Id*. at 65.) Plaintiff testified that she experiences waves of fatigue especially in her legs, that make her "feel like I have to lie down because I don't have stamina to do long tasks." (*Id*. at 66.) She also takes Neurontin for anxiety, which makes her feel "kind of dizzy and loopy" so she does not take this medicine if she has to drive. (*Id*. at 78.)

In addition to having trouble with using a computer, keyboard, or a mouse, Plaintiff testified that her hands cramp if she has "to hold onto anything for more than just a few minutes." (*Id*. at 71.) She said that she sometimes has memory issues. (*Id*. at 73.) Standing hurts her back and aggravates her foot. (*Id*. at 74.) When driving, Plaintiff has difficulty when turning her head to look for oncoming traffic or back out of a parking space. (*Id*.) She can walk but said that after 15 or 20 minutes, it aggravates her back and her right hip starts hurting. (*Id*. at 75.) She testified she "could reach up for something" but would have problems if she had to stretch. (*Id*. at 76.) She said she can lift a gallon of milk "a couple times a day." (*Id*. at 77.) When asked why she is unable to work a full-time job, Plaintiff responded, "I'm just in so much pain and the muscle spasms and the numbness, it was just becoming way too much." (*Id*. at 81.)

In assessing Plaintiff's subjective testimony about her limitations, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the

alleged symptoms" but found that Plaintiff's "statements concerning the intensity, persistence and limiting effect of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (AR 29.)  The ALJ made no finding that Plaintiff was malingering and gave four reasons for discounting Plaintiff's credibility.  The Court addresses each of the ALJ's stated reasons in turn.

### ii.  Activities of Daily Living

First, the ALJ discredited Plaintiff's subjective testimony because he found her activities of daily living inconsistent with her subjective statements about the severity of her limitations. (AR 29.)  The ALJ noted that the record evidence shows that Plaintiff's daily activities include waking up at 7:30 a.m. each morning, getting her child ready for school, driving to drop him[7] off, feeding the dog, going to the gym every morning and exercising, working on the computer paying bills, emailing and chatting with friends and family members.  (AR 29.)  Plaintiff indeed testified that she wakes at 7:30 a.m. each morning, wakes up her daughter, takes the family dogs out, brushes her daughter's hair, helps her get breakfast, drives her to school, then she goes to the gym every morning "to ride the exercise bike for 30 minutes because the doctors have told me it's better to do exercise[.] (AR 63.)  The ALJ also explained that Plaintiff could independently manage bathing and dressing, performing household chores, shopping, preparing meals, caring for her children and pets and found "these activities are generally inconsistent with her claims of incapacity."  (AR 29.)  The ALJ acknowledged that these activities of daily living "were not controlling, but "demonstrate the capacity to perform focused and sustained activities similar to the capacity required to perform work duties at many jobs." (*Id.*)  The ALJ emphasized that Plaintiff's daily activities also "demonstrate the capacity to perform common activities of daily living of non-disabled people." (*Id.*)

//

---

[7]    In his decision, the ALJ referred to Plaintiff dropping "him" off at school (AR 29), but from the Plaintiff's testimony it appears that she takes her daughter, rather than her son to school every day.  (*See* AR 63.)

Plaintiff objects that the ALJ "conveniently omits portions of Plaintiff's statements regarding her activities of daily living from the consultative psychological examination[.]" (Joint Stip. at 8.) In particular, Plaintiff emphasizes that she does little household cleaning and has a housemaid who does most of the household cleaning, Plaintiff avoids shopping because of her physical pain, and restricts her physical activities because of pain. (*Id.*; *and see* AR 325.) Plaintiff further points out that the psychological examination the ALJ cites was performed in April 2005 eight years before the March 6, 2013 alleged onset date at issue here, therefore, the activities referenced in the psychological examination report are "irrelevant." (Joint Stip. at 8.) However, the ALJ cited to the 2005 psychological examination in the portion of his adverse decision where the ALJ identified Plaintiff's severe impairments and summarized the entirety of her medical record. (*See* AR 20-22.) The ALJ acknowledged, however, that the 2005 consultative examination was "based on a prior application." (AR 21.) But the ALJ also explained that while Plaintiff alleged that she experiences significant wrist pain "with simple activities such as swiping a credit card," the record evidence included Plaintiff's admission that she can "use her upper extremities for driving a car, typing on a computer for online shopping, chatting, sending and receiving email and socializing with others." (AR 29-30 (citing AR 325, 846.)

In light of the record evidence of Plaintiff's activities of daily living, the ALJ did not arbitrarily discredit Plaintiff's subjective testimony about her symptoms. Rather, the ALJ offered a valid reason to find Plaintiff's subjective statements inconsistent with the medical record based on her daily activities. (*See* AR 28.) Plaintiff's testimony regarding her daily activities indicates that she spends a substantial part of her day performing activities that are transferable to a work setting, i.e., regularly exercising at the gym, preparing simple meals, caring for children and animals, driving children to school and activities, computer use, paying bills, emailing, and online shopping. Accordingly, the Court finds no legal error in this reason for discounting Plaintiff's testimony.

//

### iii. Inconsistencies in the Medical Record

Second, the ALJ found that Plaintiff's subjective statements about the intensity, persistence and limiting effects of her symptoms were "further undermined by inconsistencies in the record." (AR 29.)  In particular, the ALJ pointed out that Plaintiff's husband alleged that Plaintiff needed help with dressing and bathing, but Plaintiff herself indicated to the psychiatric consultative examiner that she could bathe and dress herself independently.  (*Id.*)  The ALJ noted that Plaintiff alleged no significant relief from pain in her right foot after surgery, but her surgeon, Dr. Charlton, noted significant improvement in her right foot and his treating notes following her surgery indicate Plaintiff "was doing well."  (AR 29 (citing AR 578).)  The ALJ also explained that despite her testimony that she had "significant wrist pain with simple activities such as swiping a credit card, she admitted in the record the capacity to use her upper extremities for driving a car, typing on a computer, online shopping, chatting, sending and receiving emails, and socializing with others. "  (AR 29-30.)

Plaintiff challenges the ALJ's determination that Plaintiff's subjective statements in 2014 about being able to dress and bathe herself independently are inconsistent with her husband's testimony that Plaintiff sometimes needs help with dressing and bathing.  (Joint Stip. at 9.)  Here, too, Plaintiff points out that the information the ALJ relied upon in making this determination is dated. In particular, Plaintiff's statements that she could independently dress and bathe herself were apparently reported in notes from a consultative examiner in 2014 and even then, Plaintiff reported that she "at times has difficulty related to pain, limitation of movement and weakness." (*Id*.)  Plaintiff maintains that her statement to the examiner is not inconsistent with her husband's statements.  (*Id.*)

Plaintiff also refutes the ALJ's remark that Plaintiff's statements about severe ongoing foot pain are undermined by Dr. Charlton's treating notes indicating that Plaintiff was "doing well." (Joint Stip. at 10.)  As Plaintiff points out, Dr. Charlton's notes are dated May 13, 2014,

just eight days after surgery. (*Id.* at 10.) In reviewing the notes, it is apparent that Dr. Charlton was simply assessing Plaintiff's recovery from the surgery itself:

> [Plaintiff] returns for evaluation of her right foot. She reports that she is tolerating most activity. She reports that she fell briefly and had some pain in her foot but now she reports that she is doing well. . . . I am very happy to see how well she is doing. . . I will see her back in 3 weeks and we will get a new x-ray. She will stay in the CAM walker and crutches until then so she has enough time for the bone to heal. I will give her toe spacers so she will be very careful with that.

(AR 578.) The fact that in May 2014, Dr. Charlton thought that Plaintiff was doing well in recovery from foot surgery is in no way inconsistent with her testimony in 2017 that she continues to have significant pain in her right foot. This is particularly so given that in January 2015, some six months after the surgery, Plaintiff reported to Dr. Charlton that she continued to have pain underneath the lateral sesamoid of her right foot, and Dr. Charlton himself noted that "[t]his is a very challenging problem because the lateral sesamoid is a very difficult problem to treat." (AR 856.) In addition, when Plaintiff sought a second opinion regarding her "longstanding right forefoot pain" from Dr. Deborah Castenada, Dr. Castenada noted that Plaintiff had "undergone some repeat corticosterioid injections which have not been notably helpful." (AR 887.) Dr. Castenada ultimately agreed with Dr. Charlton's original assessment that

> either the patient must live with the degree of pain she has or consider a sesamoidectomy, but certainly there are potential risks with a sesamoidectomy. Additionally, with the patient's history she has not yet up until this point had any significant benefits with surgery and I would caution her into considering more surgery unless truly her day to day activities and function are notably effected and that all different types of inserts and shoes have been tried.

(AR 888.)

Thus, looking at the record as a whole, the Court finds no material inconsistency between Plaintiff's statements about her limitations and her husband's description that she occasionally needs help with dressing and bathing and no inconsistency between Plaintiff's statements about her ongoing foot pain and the treatment records that document her foot condition was challenging and difficult to treat. Accordingly, substantial record evidence does not support the ALJ's second reason for the ALJ discounting Plaintiff's subjective statements regarding the severity of her limitations due to pain.

### iv. Noncompliance with Medical Advice

Third, the ALJ discounted Plaintiff's credibility because he concluded that she had not been fully compliant with medical advice. (AR 30.) The ALJ cited the worker compensation physician's recommendation that she join a gym to engage in aquatic (pool) exercise," while Plaintiff indicated she rides a bike at the gym. (*Id.* (citing AR 547).) The ALJ also noted that Plaintiff was prescribed Prozac for mental health complaints, but she "unilaterally stopped taking Prozac with no indication as to what the adverse side effects were." (AR 30.) In addition, the ALJ explained that although Dr. Nagel recommended that Plaintiff consult with a neurologist regarding her continuing headaches, "there does not appear to be documentation of compliance with medical advice to consult with a neurologist." (*Id.*) Finally, the ALJ observed that the psychiatric consultative examiner (CE) recommended "psychotherapy and/or treatment by a psychiatrist," but the record evidence indicates that Plaintiff "has not attended treatment with a mental health professional during the entire relevant period of time at issue." (*Id.*) After citing each of these examples, the ALJ concluded, "[n]on compliance with medical advice tends to diminish the consistency of her allegations." (*Id.*)

//

//

Plaintiff argues that none of the examples of "noncompliance" that the ALJ gave are legally sufficient or supported by the record evidence. (Joint Stip. at 11-12.) Specifically, Plaintiff emphasizes that the record indicates that the treatment recommendation was that Plaintiff join a gym or health club with "access to aquatic exercises" but she was not required to engage in aquatic activities as opposed to other forms of exercise. (*Id.; and see* AR 547). On this point, the Court agrees with Plaintiff. The fact that Plaintiff exercises every day on the bike instead of in the pool, does not credibly indicate she is noncompliant with medical advice. Plaintiff also argues that the ALJ's reference to the fact that she discontinued taking Prozac is irrelevant because this notation was from a 2005 record, some eight years before the relevant time period for this case. (Joint Stip. at 11.) The Court also agrees that Plaintiff's discontinued use of Prozac in 2005 is not a clear and convincing reason supported by substantial record evidence to discount Plaintiff's subjective statements. Indeed, the record establishes that Plaintiff takes other strong antidepressant and anxiety medications, including nortriptyline and Ativan. (AR 65.)

In February 2014, a Primary Treating Physician's Progress Report from Dr. Nagle in connection with Plaintiff's Workers' Compensation case, recommended "an updated neurology consult for continuing headaches." (AR 711.) Plaintiff argues that no credence should be given to the ALJ's reasoning about this recommendation because "the neurologist visit would have to be authorized by the insurance company [and] Plaintiff had no control over such authorization for treatment." (Joint Stip. at 11.) Plaintiff's argument is entirely speculative. Nothing in the record indicates that Plaintiff ever attempted to seek an authorization for the neurology consultation in order to comply with the recommendation. Thus, in light of Plaintiff's testimony that she has frequent migraines that sometimes do not respond to medication, the ALJ's reliance on Plaintiff's failure to consult with a neurologist as evidence of noncompliance with medical advice is a clear and convincing reason supported by the record evidence that supports the ALJ discounting Plaintiff's subjective statements about the severity of her limitations with respect to her headaches.

Accordingly, the Court finds no legal error in this aspect of the ALJ's credibility determination. Similarly, Plaintiff's failure to seek psychotherapy or psychiatric treatment for her mental health issues, even though she described herself as having severe depression, is also a clear and convincing reason, fully supported by the medical record for the ALJ's assessment that Plaintiff's subjective statements about her limitations were not fully credible.

### v. Limited and Conservative Treatment

The fourth reason the ALJ gave for discounting Plaintiff's subjective statements about the severity of her symptoms is the "limited and conservative treatment" that she has received from treating physicians. (AR 30.) Evidence of conservative medical treatment can be a legitimate consideration when evaluating a claimant's subjective symptoms. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).

Here, the ALJ noted that "such treatment is inconsistent with, and would not be expected from treating physicians if they found the level of severity of symptoms as alleged by the [Plaintiff]." (*Id.*) However, this is the full extent of the ALJ's assessment. The ALJ does not identify *any* record evidence as examples of specific treatment modalities that support his assessment that Plaintiff's treatment was more conservative than one would expect based on her allegations about the severity of her symptoms. (Joint Stip. at 12.) Accordingly, this reason is neither clear and convincing nor supported by substantial record evidence. Nevertheless, as noted above, the ALJ provided other legally valid reasons for discrediting Plaintiff's subjective testimony.

//
//
//

### vi. Remand Is Not Warranted

As discussed, several of the ALJ's reasons for discounting Plaintiff's subjective statements regarding the severity of her limitations are not legally sufficient. Even so, any error is harmless. *See Stout v. Comm'r, Soc Sec. Admin*, 454 F.3d 1050, 1055 (9th Cir. 2006) (defining harmless error as a mistake that is inconsequential to ALJ's ultimate disability conclusion). An ALJ's adverse decision may be affirmed under the harmless error standard where the ALJ provides "other record-supported reasons for discrediting the claimant's testimony." *Id.* Here, because the ALJ provided other clear and convincing reasons based on Plaintiff's activities of daily living and certain failures to comply with medical advice, any errors "do[] not negate the validity of the ALJ's ultimate [credibility] conclusion." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson*, 359 F.3d at 1197). Consequently, the ALJ's decision discounting Plaintiff's testimony remains valid and the Agency's decision-making path is readily discernible. *Carmickle,* 533 F.3d at 1163. Accordingly, remand is not warranted on this disputed issue.

//
//
//
//
//
//
//
//
//
//
//
//
//

# CONCLUSION

For the reasons stated above, the ALJ did not err in relying on the testimony of the VE at step five to conclude that Plaintiff is capable of performing other occupations available in significant numbers in the national economy and did not err in discounting Plaintiff' subjective testimony about the severity of her symptoms and limitations based on her activities of daily living. Therefore, IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: June 18, 2019

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE